IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| Securities and Exchange Commission, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. |
| ) | |
| Matthew E. Kopsky and Ronald W. ) | |
| Davis, ) | |
| ) | Trial by Jury Demanded |
| Defendants. ) | |

# COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("the Commission") alleges as follows:

## Summary

1. This case involves insider trading in the securities of Engineered Support Systems, Inc. ("Engineered Support" or "the company"), a defense contractor headquartered in St. Louis, Missouri.

2. During 2003, Ronald W. Davis was one of the four highest-ranking officers at Engineered Support. By virtue of his position, Davis received Engineered Support's quarterly earnings information and yearly earnings guidance shortly before each public announcement.

3. Matthew E. Kopsky was Davis' broker and financial advisor, as well as a close friend. Davis repeatedly tipped Kopsky by sharing material, nonpublic information regarding Engineered Support's upcoming earnings announcements shortly before each announcement for the first three quarters of 2003.

4. For each of the first three quarters of 2003, Engineered Support announced earnings that significantly outperformed analysts' estimates and raised its 2003 earnings guidance above analysts' estimates. Engineered Support's stock price increased more than 10% on the day of each earnings announcement.

5. In February of 2003, Davis tipped Kopsky by forwarding an email containing material, nonpublic information regarding Engineered Support's quarterly earnings announcement and an upcoming acquisition. Kopsky purchased Engineered Support stock for his wife's account the day after receiving this email. In addition, from February through August of 2003, Davis telephoned Kopsky shortly before the company's public earnings announcements. Following those calls, Kopsky purchased Engineered Support securities for himself, his family members, and/or his clients shortly before the company's earnings announcements and sold all of these securities following the announcements.

6. For each of these purchases, Kopsky committed between one-third and three-quarters of the assets which were available to him for investment. In addition, Kopsky bought Engineered Support call options for the first time before the company's third quarter earnings announcement, which most significantly outperformed market expectations; Kopsky partially financed his option purchases by drawing down nearly all of the cash available on his home equity line of credit. Kopsky made a total profit of $276,259 on these trades, including $107,062 for himself and his wife, and $169,197 for his clients.

7. By engaging in the conduct described above, and described more fully below, Kopsky and Davis each violated Section 10(b) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## Jurisdiction and Venue

8. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1.

9. This Court has subject matter jurisdiction over this action pursuant to Sections 21(e), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1, and 78aa.

10. This Court has personal jurisdiction over the Defendants, and venue is proper in this Court, because both of the defendants reside in this District and the acts, transactions, practices and course of conduct giving rise to the violations alleged in this Complaint occurred in this District.

## Defendants

11. Matthew E. Kopsky, age 40, is a resident of Chesterfield, Missouri. Currently, Kopsky is a principal of HM Capital Management, LLC, which is an investment adviser registered with the state of Missouri. From 2000 through 2005, Kopsky was employed by Prudential Securities, Inc., and its successor Wachovia Securities LLC, as a registered representative.

12. Ronald W. Davis, age 60, is a resident of Chesterfield, Missouri. Davis was employed by Engineered Support and its predecessor from 1983 until his retirement in May 2005. Davis served as Engineered Support's President of Business Development from 2002 through May 2005. From 1999 through May 2005, Davis also served as a member of Engineered Support's Office of the Chairman, which consisted of the

Company's four highest ranking officers. Further, Davis was a member of Engineered Support's Board of Directors from March 2003 through May 2005.

### Relevant Entity

13. Engineered Support Systems, Inc. is a Missouri corporation with its principal place of business in St. Louis, Missouri. Since January 31, 2006, Engineered Support has been owned by DRS Technologies, Inc. Prior to that date, Engineered Support was a publicly traded holding company for fourteen wholly-owned subsidiaries that design and manufacture military support equipment and electronics, primarily for the U.S. Department of Defense. The company and its subsidiaries employ more than 3,000 people and its main products include tank trailers, heavy cargo loading equipment, portable generators, field shelters, distribution systems for fuel, water and air, and radar and other electronics systems. Until its acquisition by DRS, Engineered Support's common stock was traded on the Nasdaq NMS, and its options were traded on the Chicago Board Options Exchange.

### Factual Background

A. **Davis' Relationship with Kopsky**

14. Davis and Kopsky are close friends and have known each other more than twenty years. Davis and Kopsky play golf together and attend many of the same social functions. Davis knows Kopsky's wife and children, and *vice versa*. Kopsky's father belongs to Davis' country club and has done legal work for Davis. Kopsky attended the wedding of Davis' daughter. Kopsky also has made several donations to a scholarship fund established by Davis and his wife to honor the memory of their son.

15. Kopsky was Davis' broker for more than ten years and, until recently, advised Davis on investments, tax matters, estate planning and the purchase of significant assets. Davis hired Kopsky as his broker shortly after Kopsky became licensed, based upon their close personal relationship. Kopsky also manages an investment account for Davis' daughter.

**B.     Davis' Receipt and Use of Confidential, Nonpublic Information Regarding Engineered Support**

16. As a member of Engineered Support's Office of the Chairman, Davis regularly received the company's quarterly earnings information and earnings guidance before this information was announced to the public. Davis also received drafts of Engineered Support's earnings releases and planned remarks for the company's earnings conference calls with investors and analysts. Davis owed fiduciary duties to Engineered Support and was required to maintain the confidentiality of any information in his possession about the company's earnings or financial performance until the company disclosed that information to the public.

17. Davis shared confidential, nonpublic information from the internal communications of Engineered Support executives with Kopsky. In 2002, Kopsky's employer, Prudential Securities, made a proposal to manage Engineered Support's retirement plans. Davis forwarded to Kopsky certain internal emails containing management discussions about the retirement plans and an upcoming shareholder meeting to vote on the plan. Davis also forwarded to Kopsky an email from Engineered Support's Chairman, addressed to company executives, which recommended that the company select Prudential Securities to manage the company's benefit plans. Davis called the email "our secret." Also in 2002, Davis forwarded to Kopsky an email from

5

the director of an investment banking firm to Engineered Support executives, which disclosed the fact that the company was discussing potential acquisition targets with the investment firm.

### C. Davis and Kopsky Knew that Insider Trading Was Prohibited.

18. Engineered Support had an insider trading policy that prohibited employees from trading on, or sharing with others, confidential information about Engineered Support which might have an impact on the company's stock price. On occasion, Davis received notices regarding Engineered Support's insider trading policy, along with reminders that company officers were prohibited from trading in company stock just before or after earnings announcements.

19. Kopsky's employers, Prudential Securities and Wachovia Securities, both had written policies which prohibited insider trading. Both policies specifically prohibited employees from trading securities in their own accounts, or in the accounts of brokerage customers, while in the possession of any material, nonpublic information about a company which was the issuer of those securities. Kopsky was aware of these prohibitions.

20. By 2003, Kopsky also knew that Engineered Support prohibited trading on material nonpublic information, and that Davis was subject to that prohibition, because Davis had provided him with a copy of the company's insider trading policy.

### D. During 2003, Kopsky Had Significant Debts and Few Liquid Assets.

21. In 2001, Kopsky purchased a new home for $1.3 million. Kopsky had a $900,000 mortgage obligation on that property.

22. During 2002, Kopsky spent nearly $200,000 on furnishings and improvements for his new home, $60,000 to join a country club, and approximately $40,000 at retail stores. Kopsky also suffered more than $100,000 in losses to his own personal investments. By the end of 2002, Kopsky had approximately $60,000 in his bank and brokerage accounts, down from approximately $600,000 at the end of 2001. Furthermore, during 2002, Kopsky obtained a $150,000 home equity line of credit and borrowed more than $70,000 from this line of credit to fund his expenditures.

23. When Kopsky joined Prudential Securities in 2000, the firm loaned him more than $900,000 as an advance against future earnings. Each year during his employment, a portion of that total amount was deemed to be earned or recognized as income, and therefore became taxable. By 2003, Kopsky had spent nearly all of the Prudential loan or advance. However, he still expected to incur and owe taxes on more than $600,000 of that amount.

24. By 2003, Kopsky had acquired significant debts and liabilities. Moreover, Kopsky spent far more than he earned in 2002 and had few liquid assets. By the beginning of 2003, Kopsky had saved very little for the education of his four children or for his own retirement.

E.  **Kopsky's Purchases of Engineered Support Securities Before the Company's Announcement of Earnings for the First Quarter of 2003.**

25. On Tuesday, February 25, 2003, Engineered Support announced "record" first quarter earnings from continuing operations of 50 cents per share, beating analysts' estimates of 45 cents per share by 11.1%. The company also raised its 2003 revenue forecast from $460 million to $475-485 million and its 2003 earnings forecast from $1.91 per share to $2.00-2.05 per share. These estimates exceeded analysts' forecasts of $460.5

7

million revenue and $1.92 per share. Engineered Support's stock price closed up 11.5% on the day of the announcement.

26. Davis provided Kopsky with material, nonpublic information about Engineered Support before the company's first quarter earnings announcement. More specifically:

(a) On February 20, Daniel Kreher, Engineered Support's Vice President of Investor Relations forwarded an analyst's report on Engineered Support to company officers, including Davis, by email. Mr. Kreher added the following comments:

> A fair assessment of ESSI by [the analyst] based upon what we've told the Street so far. I think he will be pleasantly surprised by TAMSCO acquisition -- and its reasonable pricing --, our potential increase in top line and earnings guidance for 2003 -- even if much of the increase in [sic] attributable to Radian (second half of year mostly which should be considered internal growth) and when we see some momentum in sustainable new orders stemming from IRAQ and global military activity. I bet he may have a rating change after next Tuesday, or at least a new price target, but as they say youneverknow [sic].

Davis forwarded this email to Kopsky an hour and a half after receiving it and wrote above Kreher's comments: "FYI- Private." Engineered Support's upcoming acquisition of TAMSCO had not been announced to the public, nor had the company announced a potential increase in earnings guidance for 2003.

(b) By Thursday, February 20, Davis had received a draft of Engineered Support's earnings release and remarks for the upcoming conference call to

8

announce those earnings. Davis called Kopsky at 9:23 a.m. on Friday, February 21 and spoke to him for six minutes.

27. Kopsky used the information provided by Davis to purchase shares of Engineered Support. At this time, neither Kopsky nor his wife owned any shares of Engineered Support, and Kopsky had not purchased any company stock for their own accounts in more than a year. At 9:32 a.m. on February 21, three minutes after concluding his telephone conversation with Davis, Kopsky purchased 1,000 shares of Engineered Support stock for his wife's account. Kopsky purchased an additional 500 shares of Engineered Support stock the morning of Monday, February 24, for a total investment of $53,114. Kopsky made all of these purchases for his wife's account and did not purchase any shares of Engineered Support on behalf of his clients. Kopsky committed more than one-third of the assets he and his wife had available for investment in these trades.

28. On Tuesday, February 25, after Engineered Support's positive earnings announcement, Kopsky sold all 1,500 shares for a profit.

**F. Kopsky's Purchases of Engineered Support Securities Before the Company's Announcement of Earnings for the Second Quarter of 2003.**

29. On Wednesday, May 28, 2003, Engineered Support announced "record" second quarter earnings from continuing operations of 54 cents per share, beating analysts' estimates of 50 cents per share by 8%. The company also raised its 2003 revenue and earnings forecasts to $535-545 million and $2.20-2.25 per share, respectively. These estimates exceeded analysts' forecasts of $473 million and $2.05 per

9

share. Engineered Support's stock price closed up 10.9% on the day of the announcement.

30. Davis provided material, nonpublic information about Engineered Support's earnings to Kopsky before the company's second quarter earnings announcement. More specifically, by Wednesday, May 21, Davis had received a draft of the company's remarks for the upcoming conference call to announce Engineered Support's earnings, which included the increased fiscal year 2003 revenue and earnings guidance figures. In addition, Davis also had received a draft earnings release containing the company's quarterly earnings figures by Friday, May 23. Davis called Kopsky on Tuesday, May 27 at 11:29 a.m. and spoke to him for twelve minutes.

31. Kopsky used the information provided by Davis to purchase shares of Engineered Support. At 11:58 a.m. on Tuesday, May 27, seventeen minutes after concluding his telephone conversation with Davis, Kopsky began purchasing Engineered Support stock. Kopsky purchased a total of 10,500 shares of company stock for his wife and his clients, for a total investment of $357,583. Kopsky committed $51,245 to these trades, which was nearly half of the assets he and his wife had available for investment.

32. The following day, May 28, after Engineered Support's positive earnings announcement, Kopsky sold all 10,500 of these shares for a profit.

**G. Kopsky's Purchases of Engineered Support Securities before the Company's Announcement of Earnings for the Third Quarter of 2003.**

33. On Tuesday, August 26, 2003, Engineered Support announced "record" third quarter earnings of 72 cents per share, far surpassing analysts' estimates of 58 cents per share by 24.1%. Engineered Support also raised its 2003 revenue guidance to "at

10

least $550 million," which exceeded analysts' estimates of $545.2 million, and raised its 2003 earnings guidance to $2.40-$2.45 per share, which exceeded analysts' estimates of $2.22 per share. Engineered Support also provided 2004 earnings guidance "approaching the $3 threshold," which surpassed analysts' estimates of $2.57 per share. Engineered Support's stock price closed up 17% on the day of the announcement.

34.  Davis provided material, nonpublic information about Engineered Support's earnings to Kopsky before the company's third quarter earnings announcement. By Thursday, August 21, Davis had received the third quarter earnings figures and a draft earnings release. Davis called Kopsky twice that day. At 1:03 p.m., Davis called Kopsky and spoke to him for ten minutes. At 4:54 p.m., after the market had closed, Davis called Kopsky and spoke to him for twenty-two minutes.

35.  At 7:17 p.m., just two hours after this second telephone call from Davis, Kopsky sent an email to Michael F. Shanahan, Sr., Engineered Support's Chairman and founder (who was vacationing in Florida at the time), and to his son Michael F. Shanahan, Jr., a member of the company's Board of Directors and Kopsky's close friend. Kopsky concluded the email by writing: "Hope you are enjoying your trip. Shareholders certainly are." Sixteen minutes later, Kopsky called a friend and told him that he was putting his clients in Engineered Support.

36.  Kopsky used the information provided by Davis to purchase Engineered Support securities. At 8:19 a.m. on August 22, the morning after his two telephone conversations with Davis, Kopsky began purchasing Engineered Support securities for himself, his wife, his father, his uncle, Kopsky Realty Venture (a family partnership), and a number of his Wachovia clients, for a total investment of $1,191,252. Kopsky

purchased $49,715 in Engineered Support call options for his wife's account and $27,774 in company stock in his own IRA (where he was not authorized to trade options). Kopsky apparently had never purchased Engineered Support call options before, and had rarely traded in options since 2001.

37. Kopsky purchased 200 "September 50" call option contracts for $18,615 and 100 "September 45" call option contracts for $31,100, when the company's stock price was approximately $47 per share. The options were set to expire in twenty-nine days. If the price of Engineered Support's stock had not reached at least $50 per share within that period of time, Kopsky's investment could have lost thousands of dollars.

38. In making these purchases, Kopsky invested nearly three-quarters of the assets he and his wife had available for investment, including more than 90% of the assets in his own IRA, in Engineered Support securities. He also used $25,000 of the $28,775 remaining on his $150,000 home equity line of credit to purchase call options.

39. Kopsky also invested far more of his clients' money in Engineered Support stock than he had during the second quarter of 2003. For a number of his clients, Kopsky sold other securities they held in order to fund the purchase of Engineered Support stock. For several of these clients, this purchase of Engineered Support stock represented more than half of the value of their account with Kopsky. One of Kopsky's clients deposited an additional $50,000 in his account to fund the purchase of Engineered Support stock after receiving an August 22 phone call from Kopsky.

40. After Engineered Support's positive earnings announcement on August 26, Kopsky began selling all of the Engineered Support securities he had purchased for himself and others. He sold all of these securities over a two-day period. Kopsky and his

.
.

wife earned a profit of $102,521 on these trades, as well as $142,181 in profits for his clients, for a total profit of $244,702. By trading in options, Kopsky and his wife earned a return of 132% on their investment in less than three business days.

      **H.**    **Kopsky Altered His Pattern of Trading Before Engineered Support's Announcement of Earnings for the Fourth Quarter of 2003.**

    41.    In September of 2003, the National Association of Securities Dealers ("NASD") began an investigation into the trading of Engineered Support securities before the company's third quarter earnings announcement. As part of that investigation, the NASD contacted Engineered Support and requested that company officials identify anyone they knew from a list of the purchasers of company stock, describe the nature of their relationships to those persons and the frequency of contact, disclose any contacts with those persons during the month of August, and describe any circumstances under which these individuals may have learned about the company's business activities.

    42.    Engineered Support circulated this request to its officers, directors and certain other employees who had knowledge of the company's third quarter earnings results. Each of these individuals, including Davis, provided information which was incorporated into the company's response.

    43.    In responding to the NASD's questions, Davis admitted that Kopsky was a friend and his financial advisor, with whom he had contact several times per year to discuss investments. However, Davis claimed that he could not recall if he contacted Kopsky during August of 2003. Davis also stated that he was not aware of any circumstances under which Kopsky would have learned of nonpublic information about the company.

44. Kopsky purchased Engineered Support securities, for himself, his wife, and his clients, prior to the company's announcement of earnings for the fourth quarter of 2003. However, after the NASD its investigation, Kopsky changed the pattern he had followed before the company's previous three earnings announcements. Kopsky began buying and holding Engineered Support securities nearly one month before the company's announcement of fourth quarter earnings.

## Count I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

45. Paragraphs 1 through 44 are re-alleged and incorporated by reference as if fully set forth herein.

46. At all relevant times, Davis knew, or was reckless in not knowing, that information regarding Engineered Support's quarterly earnings, earnings guidance and unannounced acquisitions was material, confidential and nonpublic. In breach of the duty of trust and confidence which he owed to Engineered Support, while in possession of this information, he disclosed the information to Kopsky whom he knew, or was reckless in not knowing, would purchase Engineered Support securities on the basis of that information and recommend the purchase to others on the basis of that information.

47. At all relevant times, Kopsky knew or should have known that the information Davis conveyed to him regarding Engineered Support's quarterly earnings, earnings guidance and unannounced acquisitions was improperly obtained and nonpublic. While in possession of this material, nonpublic information, Kopsky purchased Engineered Support securities, for himself, his wife and his clients, and recommended the

14

purchase of Engineered Support securities to family, friends, clients and others on the basis of that information.

48.     By their conduct described above, the Defendants, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly, (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements true; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons. By reason of the foregoing, the Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## Relief Requested

Wherefore, the Commission requests that this Court:

### I.

Permanently restrain and enjoin the Defendants and their agents, servants, employees, representatives, attorneys-in-fact, assigns and those persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Order Matthew E. Kopsky and Ronald W. Davis, jointly and severally, to disgorge the profits from each trade in Engineered Support securities which Kopsky entered into for himself, his wife, or his clients on the basis of material, nonpublic information, including prejudgment interest thereon.

### III.

Order each of the Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

### IV.

Grant such other relief as this Court deems appropriate.

### V.

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: February 26, 2007.

Respectfully submitted,

*/s/ Robert M. Moye*
Robert M. Moye  (IL Bar # 6225688)
James A. Davidson (IL Bar # 6206786)
Jeffrey A. Shank (IL Bar # 6283981)
U.S. Securities and Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, Illinois  60604
(312) 353-7390
(312) 353-7398 (fax)

*Attorneys for the Plaintiff, the United States Securities and Exchange Commission*
