# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| Securities and Exchange Commission, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:07-cv-00379-RWS |
| | ) | |
| Matthew E. Kopsky and | ) | |
| Ronald W. Davis, | ) | |
| | ) | |
| Defendants. | ) | |

---

# DEFENDANT DAVIS' MEMORANDUM SUPPORTING
# MOTION FOR SUMMARY JUDGMENT

---

**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**

David V. Capes – Fed. #2776
Jeffrey A. Cohen – Fed. #66834
7701 Forsyth Boulevard, 12th Floor
St. Louis, Missouri 63105
(314) 721-7701 (phone)
(314) 721-0554 (fax)

**MAYER BROWN LLP**

Stephen J. Crimmins
Thomas J. Hershenson
Michael S. Passaportis
1909 K Street NW, 12th Floor
Washington, DC 20006-1101
(202) 263-3000

# TABLE OF CONTENTS

Page

I.  SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE SEC CANNOT ESTABLISH THE "PERSONAL BENEFIT" ELEMENT REQUIRED BY THE SUPREME COURT IN DIRKS ....................................... 3

   A.  The Supreme Court Requires the SEC to Prove a Tipper "Benefit" ......... 3

   B.  Davis Received No Benefit From Kopsky's Trading .............................. 7

II.  SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE SEC CANNOT ESTABLISH THE *SCIENTER* ELEMENT ............................... 9

   A.  The Supreme Court Requires the SEC to Prove Tipper's *Scienter* .......... 9

   B.  Any Suggestion of *Scienter* Negated by ESSI's Practice of Routinely Entrusting Kopsky With Material Nonpublic Information ............................................................................................ 10

III.  SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE EARNINGS SPECULATION IN DAVIS' FEBRUARY 2003 EMAIL, THE SEC'S ONLY PURPORTED DIRECT EVIDENCE HERE, DOES NOT SATISFY THE MATERIALITY ELEMENT .......................................... 13

IV.  SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE SEC LACKS THE "SOMETHING MORE" REQUIRED FOR A CIRCUMSTANTIAL INSIDER TRADING CASE TO REACH A JURY ....... 16

   A.  Mere "Possibility" of Insider Trading Is Not Enough ............................ 17

   B.  Speculation Concerning $400 Profits in First Quarter 2003 .................... 19

   C.  Speculation Concerning $4,000 Profits in Second Quarter 2003 ............ 22

   D.  Speculation Concerning $100,000 Profits in Third Quarter 2003 .......... 23

   E.  Kopsky's ESSI Trading Not Aberrational ............................................. 26

      1.  Earlier Kopsky Trading Around ESSI Earnings (2nd Quarter 2001) ..................................................................... 27

      2.  Other Kopsky Six-Figure Investments in ESSI ................................. 28

      3.  Later Kopsky Trading Around ESSI Earnings (4th Quarter 2003) ..................................................................... 28

      4.  Kopsky's "Mosaic" Information About ESSI ..................................... 29

      5.  Rationale for Kopsky Trading Around ESSI Earnings ....................... 30

CONCLUSION ............................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)..................................... 1

*Basic, Inc. v. Levinson,* 485 U.S. 224 (1988)............................................... 14

*Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007) ............................... 7, 9

*Celotex Corp. v. Catrett,* 477 U.S. 317 ..................................................... 1, 2

*Dirks v. SEC,* 463 U.S. 646 (1983). .................................................... *passim*

*Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir. 1980)......................... *30*

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976)......................................... 9

*Freeman v. Decio,* 584 F.2d 186 (7th Cir. 1978)........................................ 26, 27

*In re Apple Computer Sec. Litig.,* 886 F.2d 1109 (9th Cir. 1989) .................... 27

*In re Dirks,* Exchange Act Rel. No. 17480, 21 S.E.C. Docket (CCH) 1401
    (Jan. 22, 1981). ....................................................................... 30

*In re Motel 6 Securities Litigation,* 161 F. Supp. 2d 227 (S.D.N.Y. 2001) .......... 6

*K&S Partnership v. Continental Bank, N.A.,* 952 F.2d 971 (8th Cir. 1991)........ 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).......... 1

*Reasonover v. Washington,* 60 F. Supp. 2d 937 (E.D. Mo. 1999)................... 14

*SEC v. Blackwell,* 291 F. Supp. 2d 673 (S.D. Ohio 2003)............................ 6

*SEC v. Duclaud,* 184 F. Supp. 2d 365 (S.D.N.Y. 2002)........................... 17, 22

*SEC v. Ginsburg,* 362 F.3d 1292 (11th Cir. 2004) ..................................... 19

*SEC v. Adler,* 137 F.3d 1325 (11th Cir. 1998)......................................... 19

*SEC v. Goldinger,* 106 F.3d 409 (9th Cir. 1997). .................................. 18, 22

*SEC v. Heartland Advisors, Inc.,* 2006 U.S. Dist. LEXIS 62450 (E.D. Wisc. 2006). 18, 26

*SEC v. Hoover,* 903 F. Supp. 1135 (S.D. Tex. 1995) ............................... 14, 17

*SEC v. Maio,* 51 F.3d 623 at 627-28 (7th Cir. 1995)................................. 6

*SEC v. Maxwell,* 341 F. Supp. 2d 941 (S.D. Ohio 2004)......................... 5, 6, 8

*SEC v. Sargent,* 229 F.3d 68 (1st Cir. 2000)......................................... 6

# TABLE OF AUTHORITIES (cont'd)

*SEC v. Sekhri*, 2002 WL 31654969 (S.D.N.Y. Nov. 22, 2002)..........................…... 6

*SEC v. Switzer*, 590 F. Supp. 756 (W.D. Okla. 1984) .......................................…... 8

*SEC v. Talbot*, 430 F. Supp. 2d 1029 (C.D. Cal 2006) ...................................…... 2

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) .....................................................…... 6

*SEC v. Yun*, 327 F.3d 1263 (11th Cir. 2003) .................................................…... 6

*State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981)..................… 30

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977)..........................… 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007). ..............................…... 9

*Underwood v. Colonial Penn Ins. Co.*, 888 F.2d 588 (8th Cir. 1989) ...............................… 14

*Worlds of Wonder Securities Litig.*, 35 F.3d 1407 (9th Cir. 1994)...................................… 27

**Other Authorities**

T. Gorman, "Is Evidence of Contacts Followed by Trading Sufficient to
Infer and Prove Tipping in an Insider Trading Case? The 'Plus Factor'
Rule," 34 Securities Regulation Law Journal 1 (Fall 2006) ........................ 18, 19

## DEFENDANT DAVIS' MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT

The SEC charges Defendant Matthew E. Kopsky, a stockbroker, with insider trading through purchases of Engineered Support Systems Inc. (ESSI) securities for himself and his brokerage clients before ESSI's earnings announcements in the first three quarters of 2003, and sales of those securities at higher prices after the earnings announcements.[1] The SEC contends that Defendant Ronald W. Davis, an ESSI executive, disclosed to Kopsky material nonpublic information indicating that the earnings announcements during the first three quarters of 2003 would be favorable.[2]

A party may move for summary judgment by showing that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The non-moving party must then come forward with "specific facts" showing a genuine factual issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Summary judgment will be granted where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). "Where the party moving ... does not bear the burden of proof ..., he can obtain summary judgment ... simply by showing that there is an absence of evidence" on a particular element. *SEC v.*

---

[1]  While charging Kopsky with insider trading around ESSI's earnings announcements in the first three quarters of 2003, the SEC does not claim that Kopsky engaged in insider trading when he bought ESSI securities before an ESSI earnings announcement in 2001 and sold after the announcement. Nor does the SEC charge insider trading when Kopsky bought before the earnings announcement in the fourth quarter of 2003 and sold after that announcement. Nor when he made other six-figure investments in ESSI securities. As discussed below, the challenged trades were consistent with Kopsky's trading pattern and interest in ESSI securities, and his status as a sophisticated securities trader.

[2]  As discussed below, Davis obtained no benefit from Kopsky's ESSI securities transactions (a required element for the SEC to show). Davis passed a polygraph test showing that Davis did not even know that Kopsky was buying ESSI securities in 2003 (as well as supporting his other testimony). Kopsky was close to many other ESSI insiders besides Davis and had phone conversations and other contacts with them around the time of his trading. The SEC has admitted it has no idea what was said in phone conversations between Kopsky, Davis and other ESSI insiders.

*Talbot*, 430 F. Supp. 2d 1029, 1064 (C.D. Cal 2006) (summary judgment dismissing insider trading case where "SEC has not carried its burden with respect to [an] essential element"), *citing Celotex Corp. v. Catrett,* 477 U.S. at 323.

Davis moves for summary judgment here because: **(i)** the SEC has not alleged and cannot establish the "personal benefit" element required by the Supreme Court for tipper liability in insider trading cases **(POINT I** below); **(ii)** the SEC cannot establish the *scienter* element by showing that Davis acted intentionally or recklessly **(POINT II)**; **(iii)** the SEC cannot establish the materiality element for what is concededly its only supposed direct proof of tipping – an email forwarding an earlier email containing earnings-related comments – because the author of those comments has now testified that they were purely speculative **(POINT III)**;[3] and **(iv)** with discovery now completed, the SEC cannot carry its burden of proof at trial and still offers only speculation to support its claim that Davis tipped Kopsky about ESSI's earnings during the first three quarters of 2003 **(POINT IV)**.

Davis and Kopsky did not violate the law, and they are ready to so testify at trial. But this case should be dismissed on motion before trial, as the SEC plainly lacks evidence to support particular legal elements of its claim. Kopsky's counsel have advised that their client intends to join in this motion for summary judgment.

---

[3] The February 20, 2003 email in question is *sui generis* and pertains only to events during the first quarter of 2003, when Kopsky's trading profits were under $400, as discussed below. Even if it did contain material information about first quarter earnings – which its author has testified it did not – it would have no bearing on the SEC's failed attempt to otherwise cobble together circumstantial proof for the second and third quarters of 2003.

## I. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE SEC CANNOT ESTABLISH THE "PERSONAL BENEFIT" ELEMENT REQUIRED BY THE SUPREME COURT IN *DIRKS*

As described below, the SEC lacks evidence to support its claims against Davis and Kopsky. However even assuming *arguendo* and without evidentiary basis that Davis had disclosed inside information about earnings to Kopsky, the SEC has not pled and cannot satisfy the "personal benefit" element required by the Supreme Court in its seminal decision on insider trading, *Dirks v. SEC*, 463 U.S. 646 (1983).

### A. The Supreme Court Requires the SEC to Prove a Tipper "Benefit"

*Dirks* is the Supreme Court's leading case defining the so-called "classical" branch of insider trading liability.[4] In that case, a corporate officer (Secrist) tipped a broker (Dirks) that the assets of a public company (Equity Funding) were "vastly overstated as the result of fraudulent corporate practices." 463 U.S. at 648. Secrist hoped that Dirks' brokerage clients – including large institutional investors – would use the inside information to sell the stock and thereby expose the corporation's misconduct:

> "... In disclosing that information to Dirks, Secrist intended that Dirks would disseminate the information to his clients, those clients would unload their Equity Funding securities on the market, and the price would fall precipitously, thereby triggering a reaction from the authorities." [463 U.S. at 668 (dissent)]

Although Secrist tipped inside information to Dirks with the express purpose of having Dirks' clients trade on the information – selling stock to avoid a loss when the information became public – the Supreme Court held that there was no liability because Secrist did not personally benefit from tipping Dirks. The Supreme Court began its analysis by focusing on the underlying purpose of insider trading restrictions – "to

---

[4] In a "classical" case, a corporate insider tips material nonpublic information to another, who then purchases or sells the corporation's securities based on the information tipped. The other branch of insider trading liability – involving so-called "misappropriation" of material nonpublic information by the securities trader – is defined in the Supreme Court's decision in *U.S. v. O'Hagan*, 521 U.S. 642 (1997).

eliminate the idea that use of inside information for personal advantage was a normal emolument of corporate office." 463 U.S. at 654, n.10.

The Supreme Court emphasized the need to protect corporate insiders who in good faith disclose inside information by mistake – for example, by inaccurately assessing the materiality of the information disclosed or by mistakenly thinking the information was already public:

> "... All disclosures of confidential corporate information are not inconsistent with the duty insiders owe to shareholders. ... For example, it may not be clear ... to the corporate insider ... whether the information will be viewed as material nonpublic information. Corporate officials *may mistakenly think the information already has been disclosed or that it is not material enough* to affect the market. Whether disclosure is a breach of duty therefore depends in large part on the purpose of the disclosure." [463 U.S. at 661-62 (emphasis added)]

To distinguish insiders who violate their duty to shareholders from insiders who do not violate their duty, the Supreme Court established as its "test" whether the insider personally benefits from disclosing the information:

> "... Thus, *the test is whether the insider personally will benefit, directly or indirectly*, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. ..." [463 U.S. at 662 (emphasis added)]

> "... [T]he initial inquiry is whether there has been a breach of duty by the insider. This requires courts to focus on objective criteria, *i.e.*, whether the insider receives a direct or indirect personal benefit from the disclosure, such as a *pecuniary gain* or a *reputational benefit that will translate into future earnings*. ... There are objective facts and circumstances that often justify such an inference. For example, there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient. The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a *gift of confidential information to a trading relative or friend*. The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." [463 U.S. at 663-64 (emphasis added)]

*SEC v. Maxwell*, 341 F. Supp. 2d 941 (S.D. Ohio 2004), illustrates that summary judgment will be granted dismissing the SEC's complaint where the Supreme Court's *Dirks* test of personal benefit is not satisfied – *i.e.* where there is no agreement to split profits or other pecuniary benefit, no *quid pro quo*, no reputational benefit that would translate into future advantage, no particular reason to suddenly bestow a significant gift. In *Maxwell*, the court found that a corporate senior executive had tipped his barber that his company was an acquisition target. Based on this information, the barber bought stock and options, and on announcement of the acquisition made a $192,000 profit. The court found that, while the executive had tipped material nonpublic information that the barber used to trade, the executive had obtained no personal benefit. In dismissing the complaint under *Dirks*, the court explained:

> "Based on the evidence before this Court, Defendant Maxwell [the executive] did not stand to gain from disclosing material, nonpublic information concerning the Worthington merger to Defendant Jehn [the barber]. There was *no agreement to split profits or other pecuniary benefit* to Defendant Maxwell from the tip. Furthermore, the Commission has provided *no evidence of any quid pro quo*. Given the parties' relative stations in life, *any reputational benefit* to Defendant Maxwell in the eyes of his barber is extremely *unlikely to have translated into any meaningful future advantage*. *Dirks* requires an intended benefit of at least some consequence. ... While the requisite personal benefit may be shown by the intent to provide a gift to benefit the tippee, *there is absolutely no evidence that Defendant Maxwell had any reason or intent to give a gift – especially a gift of this magnitude* – to Defendant Jehn. There was no family relationship or close friendship between the two Defendants. Indeed, they did not even socialize outside of Defendant Maxwell's haircut appointments. There was no history of substantial loans or personal favors between Defendants; in short, there was *no particular reason* for Defendant Maxwell *suddenly to decide to bestow* upon Defendant Jehn *a significant gift*. *Absent some evidence of actual benefit* to Defendant Maxwell from the disclosure, the Commission cannot maintain its claims against either Defendant."

341 F. Supp. 2d at 948 (emphasis added).

5

As *SEC v. Maxwell* makes clear, when there is no evidence of pecuniary gain to the tipper, and the SEC's theory of benefit is based only on a theory that the tipper intended to give the tippee a gift, some evidence must be proffered to explain *why* such a gift would have been given. As discussed below, no such explanation is offered here. The most the SEC suggests is that that Davis and Kopsky had a work and/or social affiliation. But far from promoting the kind of "objective" test that the Supreme Court required in *Dirks*, 463 U.S. at 663, allowing liability to turn on the parties' simple acquaintance with each other would reduce the benefit requirement to no requirement at all. Indeed, the cases after *Dirks* in which lower courts have found this element to be present all involved a much closer relationship between the parties,[5] not to mention a history of monetary payments or business favors.[6]

How the courts in this District and Circuit will interpret this key *Dirks* element is a question of first impression. This Court should adhere to what the Supreme Court established as a "test" designed to protect well-meaning corporate officers and directors who did not personally benefit against the harsh consequences of an insider trading prosecution – particularly in cases where any communication that could be construed as tipping was inadvertent and never intended to facilitate any alleged violation.

---

[5] *E.g. SEC v. Warde*, 151 F.3d 42, 48-49 (2d Cir. 1998) (tipper and tippee had a "close friendship"); *SEC v. Sekhri*, 2002 WL 31654969 at *2 (S.D.N.Y. Nov. 22, 2002) (tippee was father-in-law of tipper).

[6] *E.g. SEC v. Yun*, 327 F.3d 1263, 1280 (11th Cir. 2003) (tipper and tippee "worked together ... and split commissions on various real estate transactions over the years"); *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (tipper had referred over 75 dental patients to tippee, the tippee "often" helped tipper provide service to local chamber of commerce, and tipper's relatives had had financial disagreements with tippee); *SEC v. Maio*, 51 F.3d 623 at 627-28, 633 (7th Cir. 1995) (tipper had loaned tippee substantial sums, and they had taken trips to Las Vegas together); *SEC v. Blackwell*, 291 F. Supp. 2d 673, 692-93 (S.D. Ohio 2003) (tippee was employee and "close confidant" of the tipper, who had loaned tippee money); *In re Motel 6 Securities Litigation*, 161 F. Supp. 2d 227, 230 n.1, 241 (S.D.N.Y. 2001) (tippee with terminal illness had received financial support from tipper).

## B.    Davis Received No Benefit From Kopsky's Trading

Nowhere does the SEC's Complaint allege that Davis obtained any "pecuniary gain" from Kopsky in return for allegedly giving him information concerning ESSI.  It is an undisputed fact that Davis obtained not one dime of Kopsky's profit from trading ESSI securities.  Davis likewise did not obtain what *Dirks* called a "reputational benefit that will translate into future earnings" from Kopsky, and the SEC's Complaint does not rely on such a theory.  Nor does the SEC's Complaint plead what *Dirks* called "a gift of confidential information" to the trader that "resemble[s] trading by the insider himself followed by a gift of the profits to the recipient."  463 U.S. at 663-64. [7]

At most, the SEC suggests that Davis and Kopsky were "friends."  Yet Kopsky's ties to ESSI sprang not from any friendship with Davis, but from Kopsky's long-term friendship with the company's founder, Chairman and CEO Michael Shanahan, Sr. and his son, Michael Shanahan, Jr., an ESSI director.  ESSI's Vice President - Investor Relations, Daniel Kreher, described Kopsky as virtually a member of the Shanahan family.  Kopsky and Shanahan, Jr. were "high school classmates and very close friends," as well as "closely aligned" in business.  Kopsky was "in that circle where ... you're kind of like family" to the Shanahans, with "very, very strong ... personal ties there."  [Ex. A, Kreher Dep. 136-37]  Kopsky's business partner confirmed Kopsky's close friendship with Shanahan, Jr., but testified that Kopsky's relationship with Davis was "more of

---

[7] "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 n.3 (2007).

7

some kind of a business thing,"

[Ex. K, Virant Investigative Dep. 49-50][8]

As to Davis, the SEC points to no more than

their participation in the same local charity golf tournaments,

and the engagement of Kopsky's father as attorney to provide minor legal advice to

Davis' wife on transferring title to her father's house. Kopsky is over 20 years younger

than Davis and has never been a guest at Davis' home. Davis was simply one of

numerous                                    who were Kopsky's brokerage clients and who

used Kopsky's services for exercising options.

As in *Maxwell*, there is no evidence that Davis "had any reason or intent to give a

gift – especially a gift of this magnitude" to Kopsky. 341 F. Supp. 2d at 948. Kopsky's

business acquaintance with Davis falls far short of the relationships between alleged

tipper and tippee in the "benefit" cases from other jurisdictions cited above.[9] Absent

proof of benefit, summary judgment should be granted.

---

[8] During its three-year pre-litigation investigation of this matter, the SEC took "investigative" depositions and obtained documents and records using administrative subpoena power. After filing its Complaint, the SEC took additional depositions under the Federal Rules of Civil Procedure. We understand that in addition to these many depositions, the SEC has also conducted witness interviews that were not transcribed.

[9] The SEC notes that, following the tragic death of Davis' son in a car accident and Davis' creation of a charitable fund in his memory, Kopsky made two $500 contributions, the second of which did not occur until 2004. Frankly, it is patently offensive for the SEC to suggest that this was a *quid pro quo* for an insider stock tip. In *SEC v. Maxwell*, 341 F. Supp. 2d at 948, the Court alluded to a history of substantial loans or personal favors as evidence of the kind of close friendship that would qualify under the *Dirks* "benefit" test. A tax-deductible contribution honoring the deceased son of a brokerage client and ESSI executive can hardly provide the kind of "history" noted by the *Maxwell* court as qualifying evidence. And it makes no sense to suggest that a person would risk prosecution and career consequences over two $500 charitable contributions. In comparison, ESSI's CEO Michael Shanahan, Sr. personally contributed $10,000 to the fund, and Davis has contributed over $30,000.

8

REDACTED

## II. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE SEC CANNOT ESTABLISH THE *SCIENTER* ELEMENT

### A. The Supreme Court Requires the SEC to Prove Tipper's *Scienter*

The law "does not bar trading on the basis of information inadvertently revealed by an insider." *SEC v. Switzer*, 590 F. Supp. 756, 766 (W.D. Okla. 1984) (no liability where insider negligently discussed possible merger in public place). This is because in *Dirks v. SEC*, 463 U.S. at 660, 662-64 (1983), the Supreme Court held that a tippee inherits an insider's fiduciary duty not to trade on material nonpublic information only when the insider acts with *scienter*.

*Scienter* is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). *Scienter* is established by a showing that the defendant acted intentionally or with severe recklessness, which is defined in the leading case on this point as:

> "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers [of securities] that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977). *Accord K&S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 978 (8th Cir. 1991).

Just last year, the Supreme Court ruled that, on a motion to dismiss, "an inference of *scienter* must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007). Yet in attempting to plead *scienter* here, the SEC simply recites in mechanical fashion that Davis "knew, or was reckless in not knowing, [that Kopsky] would purchase Engineered Support securities on

the basis of" any material nonpublic information Kopsky would receive about ESSI.

[Complaint ¶46] [10]

**B.     Any Suggestion of *Scienter* Negated by ESSI's Practice of Routinely Entrusting Kopsky With Material Nonpublic Information**

Summary judgment should be granted because, after extensive discovery, there is simply no evidence that Davis had any *knowledge* that Kopsky would trade or was trading ESSI securities at all in 2003.[11] But even if hypothetically Davis had disclosed earnings-related information to Kopsky, Davis cannot be found to have acted *recklessly*

---

[10] As the Supreme Court has recently observed in the securities litigation context, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

[11] With no contrary evidence, Davis has both testified and submitted to a polygraph examination to confirm his lack of knowledge of any trading by Kopsky in ESSI securities during 2003. [Ex. C]

REDACTED

11

REDACTED

REDACTED

was trusted to move about the executive offices freely and without an escort. [Ex. B, Harsin Dep. 12-13, 19-20, 36-40]

Consequently, even if Davis had made a comment to Kopsky reflecting material nonpublic information related to earnings – which Davis did not – Davis would not have acted recklessly in so doing

Absent proof of *scienter – i.e.* intentional or reckless misconduct in conveying information to Kopsky – summary judgment should be granted to Davis.

## III. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE EARNINGS SPECULATION IN DAVIS' FEBRUARY 2003 EMAIL, THE SEC'S ONLY PURPORTED DIRECT EVIDENCE HERE, DOES NOT SATISFY THE MATERIALITY ELEMENT

On February 20, 2003, ESSI's Vice President - Investor Relations Dan Kreher sent an email to Ron Davis and other ESSI executives that transmitted a new research report about ESSI by a securities analyst at Sidoti & Company. In his cover email, Kreher made the following comments:

> "A fair assessment of ESSI by Sidoti based upon what we've told the Street so far. I think he will be pleasantly surprised by TAMSCO acquisition -- and its reasonable pricing --, our potential increase in top line and earnings guidance for 2003 -- even if much of the increase is attributable to Radian (second half of year mostly which should be considered internal growth) and when we see some momentum in sustainable new orders stemming from IRAQ and global military activity. I bet he may have a rating change after next Tuesday, or at least a new price target, but as they say youneverknow." [Dep. Ex. 57]

Davis then sent the Sidoti analyst's research report on to Kopsky, and he did so by simply forwarding the Kreher email that attached the analyst's report. The SEC contends that Kreher's email (quoted in full above) contained material nonpublic information

REDACTED

about ESSI's upcoming first quarter 2003 earnings announcement, and that Davis breached his duty by forwarding the email to Kopsky.[14]

As Kopsky bought before and sold after the earnings announcement – with resulting profits of under $400 – the question is whether any information relating to earnings in the Kreher email Davis forwarded to Kopsky was material. Information is material if there is a substantial likelihood that it would have been important to a reasonable investor. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).

In *SEC v. Hoover*, 903 F. Supp. 1135 (S.D. Tex. 1995), the court granted summary judgment dismissing the SEC's insider trading complaint on a finding that the information in question was "not material as a matter of law." 903 F. Supp. at 1148. The company had been trending downward in earnings and had previously disclosed that it expected a 10 percent earnings decline. The nonpublic information charged by the SEC consisted of an internal projection by a senior financial executive that earnings could be as much as an additional two percent lower than the 10 percent decline previously forecast.

---

[14] The SEC notes that the Kreher email referred to ESSI's still-unannounced plans to acquire a company called TAMSCO. But the SEC does not charge this as a violation because it is undisputed that Kopsky both bought and sold his ESSI stock in the first quarter of 2003 *before* ESSI announced the TAMSCO acquisition. Thus, he was in and out of the stock position before the TAMSCO news hit the market and unquestionably derived no profit from the news. Indeed, if anything, Kopsky's sale of his stock before the TAMSCO announcement is consistent with a mental state *not* to trade on inside information.

A former FBI polygrapher with much experience working for the U.S. Attorney's Office in this District found Davis truthful on the following points: (i) in forwarding the February 20 email to Kopsky, Davis believed that Kopsky had prior knowledge of the pending TAMSCO acquisition; (ii) otherwise Davis did not believe that the email had material nonpublic information; (iii) Davis never knowingly provided Kopsky with material nonpublic information; and (iv) Davis did not know that Kopsky was trading ESSI stock in 2003. [Ex. C] *See Underwood v. Colonial Penn Ins. Co.*, 888 F.2d 588 (8th Cir. 1989) (upheld decision to admit polygraph to show motive, plan, scheme or design); *Reasonover v. Washington*, 60 F. Supp. 2d 937, 972 (E.D. Mo. 1999) ("the specific polygraph testing conducted by [the examiner] is sufficiently reliable to be considered by the Court").

In the present case, as in *Hoover*, the company was in a trend – positive in the case of ESSI – and a financial executive (here Kreher) was simply speculating informally about what he has called a "potential" increase, but acknowledging that it was "too early to tell." For the following reasons, as in *Hoover*, the information here in question (the earnings-related comment in Kreher's email) is "not material as a matter of law."

*First*, Kreher himself differs with the SEC on the materiality of his comments relating to earnings. In Kreher's mind, what he intended to say, and did say, in the email was simply that favorable earnings news was a mere *possibility*, and not a *probability*:

> "... I mentioned it was a potential increase in top line and earnings guidance. We ... might be doing it. We might not be doing it. It was too early to tell at that time." [Ex. A, Kreher Dep. 198]

Kreher acknowledges that the "potential increase in top line and earnings guidance" was simply speculation on his part. [Ex. A, Kreher Dep. 199-200] Kreher did not know at the time "whether or not the company was going to have any kind of increase in earnings guidance for 2003." [Ex. A, Kreher Dep. 280]

REDACTED

*Third*, Kreher's speculation about a possible favorable earnings announcement, particularly as it related to ESSI's opportunities arising from its Radian subsidiary, paralleled what was already in the public domain – and was thus not material. For example, just the month before, the St. Louis-based investment firm of Stifel, Nicolaus & Co. issued a January 14, 2003 research report noting that Radian had been awarded a major defense contract, and commenting that the contract was "further evidence that [ESSI's] acquisition of Radian will ultimately prove to be extremely successful." Stifel's report also reiterated its "Buy" recommendation for ESSI stock. [Ex. F, p. 31]

## IV. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE SEC LACKS THE "SOMETHING MORE" REQUIRED FOR A CIRCUMSTANTIAL INSIDER TRADING CASE TO REACH A JURY

A person who trades before a corporate announcement should not be prosecuted for insider trading just because that person knows and has talked to an insider. Nor should the insider be prosecuted. Trading in advance of an announcement, coupled with possible access to inside information, is not enough to survive a motion for summary judgment. Something more is required – particularly where, as here, the defendants have come forward and denied any wrongdoing in sworn testimony. As discussed below, that something more is plainly absent on this record.

---

The immediate point is that Davis observed that ESSI itself did not treat such communications as material information.

In such a context, it would not have been "reckless," the *Dirks* standard for tipper liability, for Davis to have made an earnings-related comment to Kopsky – which, in any event, Davis did not do.

16

REDACTED

## A. Mere "Possibility" of Insider Trading Is Not Enough

The United States Court of Appeals for the Ninth Circuit held in *SEC v. Goldinger*, 1997 U.S. App. LEXIS 730, at *9 (9th Cir. 1997), that "the SEC cannot merely provide circumstantial evidence to show the *possibility* of illegal trading" on inside information. The court dismissed the complaint after reviewing evidence **(i)** that a broker (Goldinger) admittedly had material nonpublic information about a proposed merger; **(ii)** that Goldinger asked a second broker (Cohen) what he knew about the target company; **(iii)** that 24 minutes later, Cohen started buying the target's stock; **(iv)** that a third broker (Gerald) then heard Goldinger and Cohen discuss how the target's put options were overpriced, meaning that its stock was undervalued; **(v)** that both Cohen and Gerald then bought additional target stock; **(vi)** that in all, Cohen and Gerald did 22 trades and accounted for 7% of the target's volume that day; and **(vii)** that after public announcement of the merger, Cohen said "we owe Jay [Goldinger] for this one." The court of appeals said that this was not enough for the case to reach a jury:

> "... The SEC relies heavily on the evidence of 'massive and well-timed trading in Thrifty stock and options' as well as the 'incriminating statements' made by various defendants acknowledging Goldinger as the source of their attention to Thrifty. The evidence is insufficient to avoid summary judgment because it cannot show that Goldinger actually disclosed to Cohen any material, non-public information about Thrifty. ...

> "... The SEC has not produced sufficient evidence for a jury to find by a preponderance of the evidence that illegal tipping occurred. ... Furthermore, the inference of more direct tipping is unreasonable because it involves too many inferred steps and amounts to no more than conjecture. ..." [1997 U.S. App. LEXIS 730, at *7, *9]

The court in *SEC v. Duclaud*, 184 F. Supp. 2d 365 (S.D.N.Y. 2002), summarized the guiding principles for granting summary judgment in favor of defendants in an SEC insider trading case:

> "The SEC's burden in an insider trading case is no less than any other party in any other case; '*summary judgment is appropriate* in *any* case *where the critical evidence is so weak or tenuous* on an essential fact *that it could not support a judgment* in favor of the nonmovant.' *SEC v. Hoover*, 903 F. Supp. 1135, 1139 (S.D. Tex. 1995).... Thus, regardless of whether the evidence offered is direct or circumstantial, the 'mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; *there must be evidence on which the jury could reasonably find for the plaintiff.*' *SEC v. Truong*, 98 F. Supp. 2d 1086, 1096-97 (N.D. Ca. 2000) ... ; *see also SEC v. Goldinger*, 106 F.3d 409, 1997 U.S. App. LEXIS 25796, at *3 (9th Cir. 1997) ('Although reasonable inferences must be drawn in the SEC's favor, *the SEC cannot merely provide circumstantial evidence to show the possibility of illegal trading.* The SEC's evidence must be sufficient to allow a reasonable jury [to] find it met its burden of persuasion at trial.'); *SEC v. Cassano,* 2000 U.S. Dist. LEXIS 15089, 2000 WL 1512617, at *2 (S.D.N.Y. Oct. 11, 2000) ('The case against the moving defendants, as they contend, appears to turn on circumstantial evidence. The Court is mindful also that *care must be exercised lest speculation substitute for reason in such a situation.*')."

184 F. Supp. 2d at 376 (emphasis added) (summary judgment for defendants). Mere suspicious contact with an insider followed by trading in the stock will not be enough for a case to proceed to trial. *E.g. SEC v. Truong*, 98 F. Supp. 2d 1086 (N.D. Cal. 2000) (summary judgment dismissing claims based simply on trades followed by contact with an insider who had access to information; summary judgment denied as to other claims based on "something more" evidence in the form of circuitous cash transfers by insider to trader at time when insider was blocked from trading, followed by circuitous cash transfers back to insider after stock sold).

Thus, in *SEC v. Heartland Advisors, Inc.*, 2006 U.S. Dist. LEXIS 62450 (E.D. Wisc. 2006), the court granted summary judgment where the evidence showed simply that (i) an investment fund portfolio manager had material nonpublic information about an upcoming devaluation of the fund, and was under an internal compliance restriction against making recommendations concerning the fund; (ii) he had lunch with an investor in the fund; and (iii) immediately after the lunch, the investor liquidated his holdings in

the fund. *See also* T. Gorman, "Is Evidence of Contacts Followed by Trading Sufficient to Infer and Prove Tipping in an Insider Trading Case? The 'Plus Factor' Rule," 34 Securities Regulation Law Journal 1 (Fall 2006) (available on Westlaw).[16]

As discussed below, if this matter were allowed to proceed to trial, the SEC would at best leave the jury seeing multiple "possibilities" of what really happened, but unable to say that illegal tipping was what "probably" happened. And even if the SEC could persuade the jury to suspect the *bona fides* of Kopsky's trading, the evidence would likewise leave the jury seeing multiple "possibilities" as to potential sources of inside information among Kopsky's many and frequent contacts with a variety of people at ESSI – including several much closer to Kopsky than Davis. With nothing more than competing possibilities, the matter should be dismissed before trial. *SEC v. Moran*, 922 F. Supp. 867, 892 (S.D.N.Y. 1996) ("if the totality of the evidence suggests an equally or more compelling inference than the SEC's allegation, the plaintiff will not have met its burden of proving its case by preponderance of the evidence").

**B.      Speculation Concerning $400 Profits in First Quarter 2003**

Kopsky traded around ESSI's earnings announcement in the first quarter of 2003. He bought about $50,000 worth of ESSI stock -- part of it on February 21 and the remainder on February 24. ESSI announced its earnings results on February 25, beating

---

[16] The Eleventh Circuit appears to disagree with these principles and find it sufficient for the SEC to show merely that a securities trader had contact with an insider who had access to information. *E.g. SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004); *SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998). However, both of these cases are distinguishable from the present matter. *Ginsburg* involved traders buying stock in two obscure communications companies just as the insider's company was in acquisition discussions with these two companies, and *Adler* involved traders who suddenly placed big bets against the company (selling stock or buying put options) just after their friend, a director, learned at a board meeting that the company had serious undisclosed financial problems. In contrast, as discussed below, Kopsky had a history of making much larger investments in ESSI and a pattern of trading around its earnings announcements.

analysts' estimates and raising its 2003 earnings forecast, and Kopsky sold his stock the same day for a profit of under $400. [Complaint ¶25, 27, 28]

The SEC charges Davis with tipping Kopsky about ESSI's first quarter earnings. As discussed above, Davis' February 20 email to Kopsky did not contain material nonpublic information about ESSI's earnings. Apart from this email, the evidence shows only the following:

- Kopsky's contacts with ESSI senior executives *other than Davis* around the time of Kopsky's first quarter purchases include the following – an incomplete list:

    - On February 19, two days before Kopsky began buying ESSI securities, ESSI Chairman and CEO Michael Shanahan, Sr. phoned Kopsky at 10:46 am. [Ex. E] The chronology ESSI provided to the SEC during its investigation shows that, by this date, two executives reporting directly to Shanahan, Sr. had received preliminary results for the quarter from ESSI's subsidiaries. [Dep. Ex. 72]

    - On February 20, the day before Kopsky began buying, ESSI director Michael Shanahan, Jr. phoned Kopsky at 10:11 am. [Ex. E] Shanahan, Jr. is the son of ESSI's Chairman and CEO.

    - On February 21, the day Kopsky began buying (and before Kopsky's subsequent purchases), ESSI VP-Investor Relations Daniel Kreher phoned Kopsky at 2:30 pm. [Ex. E] By that date, according to ESSI's chronology, Kreher had already had preliminary consolidated results for two days and had discussed the results and earnings guidance with other top ESSI executives (but not Davis). [Dep. Ex. 72]

    - On February 25, the day of the earnings announcement, Controller Steven Landmann phoned Kopsky at 11:02 am. [Ex. E]

REDACTED

- The SEC alleges that Davis had some unidentified draft version of an ESSI earnings release by February 21. [Complaint ¶26]

  - The SEC bases this allegation on a chronology that the SEC got from ESSI two years after the events. The chronology's author today has no recollection of specific dates or documents consulted. [Ex. A, Kreher Dep. 158-60; Dep. Ex. 72][17]

  - ESSI's chronology says that it was only "[s]ometime after February 21, 2003, [that] company senior management established its revised forecast revenues and earnings guidance for the year." [Dep. Ex. 72]

- On February 21, Davis phoned Kopsky at 9:23 am and spoke to him for six minutes. Three minutes elapsed between this call and Kopsky's first purchase. Three full days elapsed before Kopsky's next purchase. [Complaint ¶26]

  - The SEC admits that it does not know the exact nature of what Davis said to Kopsky in this February 21 call. [Ex. D, SEC 10/1/07 Admission No. 1].

  - The only record evidence shows that Davis was communicating during this period with Kopsky and others concerning an upcoming charity golf tournament, for which Davis and Gerald Potthoff (ESSI Chief Operating Officer) served as Co-Chairs and Kopsky served as one of the committee members, and the committee was then planning a February 25 meeting. [Ex. G, Kopsky Dep. 239-41, 244; Ex. I, Davis Dep. 40, 141-47, 151-53]

- The SEC admits that it does not know the exact nature of the information it alleges Kopsky received from Davis before Kopsky bought ESSI stock on February 21 and 24. [Ex. D, SEC 10/1/07 Admission No. 2].

Kopsky has testified at deposition that he did not receive material nonpublic information, and there is no contrary testimony. Kopsky's routine activities put him in daily contact with ESSI senior insiders at a time when their company was enjoying record performance. What beyond speculation could the jury rely on to find that Kopsky's first quarter profits of $400 resulted from an unlawful tip of material nonpublic information,

---

[17] Thus, the events occurred in 2003, but the SEC waited until 2005 to ask for a chronology. Then the SEC waited until 2007 to file litigation, which meant that Defendants only got to question witnesses in 2008. While the chronology is hearsay and of dubious value in view of its author's faded recollection, it would be manifestly unfair to use it as evidence against Defendants in these circumstances. Additionally, the SEC's decision to delay filing this case until the eve of the expiration of the statute of limitations has meant that other recollections have faded, and exculpatory documents and emails have been destroyed as ESSI was taken over by another company.

and that such a tip came from Davis? As noted above, "[a]lthough reasonable inferences must be drawn in the SEC's favor, *the SEC cannot merely provide circumstantial evidence to show the possibility of illegal trading*. The SEC's evidence must be sufficient to allow a reasonable jury [to] find it met its burden of persuasion at trial."[18] As described below, the record is similar for the second and third quarters.

## C.    Speculation Concerning $4,000 Profits in Second Quarter 2003

Kopsky traded around ESSI's earnings announcement in the second quarter of 2003. He bought about $50,000 worth of ESSI stock on May 27, and also bought $300,000 worth of the stock for his brokerage clients. ESSI announced its earnings results on May 28, beating analysts' estimates and raising its 2003 earnings forecast, and Kopsky sold ESSI stock he had bought for himself and his brokerage clients before the announcement, with personal profits of about $4,000. [Complaint ¶29, 31, 32]

The SEC charges Davis with tipping Kopsky about ESSI's second quarter earnings, but the evidence shows only the following:

- Kopsky's contacts with ESSI senior executives *other than Davis* around the time of Kopsky's second quarter purchases include the following -- an incomplete list:

    - On May 20, ESSI's Assistant Controller Diane Harsin phoned Kopsky at 9:24 am. [Ex. E] According to ESSI's chronology, Harsin by then had preliminary consolidated results for the quarter. [Dep. Ex. 72]

    - On May 21, ESSI's Chairman Michael Shannahan, Sr. phoned Kopsky from his office at ESSI at 1:23 pm. [Ex. E] According to ESSI's chronology, preliminary consolidated results were discussed with Shanahan, Sr. around this time. [Dep. Ex. 72]

    - On May 22, Michael Shanahan, Jr., ESSI director and son of ESSI's Chairman, exchanged phone calls or voicemails with Kopsky on no less

---

[18] *SEC v. Duclaud*, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002) (emphasis added), granting summary judgment dismissing insider trading case, and quoting *SEC v. Goldinger*, 106 F.3d 409, 1997 U.S. App. LEXIS 25796, at *3 (9th Cir. 1997).

than *six* occasions – at 10:49 am, 11:08 am, 11:31 am, 2:00 pm, 4:04 pm and 4:13 pm. [Ex. E]

- On May 22, ESSI Chairman Michael Shannahan, Sr. transmitted an unidentified facsimile from the ESSI offices to Kopsky at 3:07 pm. [Ex. E] As noted, Shanahan, Sr. had preliminary earnings results by this time. [Dep. Ex. 72]

- On May 28, Kopsky phoned Michael Shanahan, Jr. at 12:58 pm. [Ex. E]

- The SEC contends that Davis had some unidentified draft version of an ESSI earnings release by May 23, based on a chronology that the SEC got from ESSI two years later. Again, the chronology's author today admits that "I don't have any specific recollection with respect to the second quarter." [Complaint ¶30; Ex. A, Kreher Dep. 158-59, 169; Dep. Ex. 72]

- On May 27, Davis phoned Kopsky at 11:29 am and spoke to him for twelve minutes. Seventeen minutes elapsed between this call and Kopsky's first purchase. [Complaint ¶30, 31]

  - The SEC admits that it does not know the exact nature of what Davis said to Kopsky in the May 27 call. [Ex. D, SEC 10/1/07 Admission No. 3]

  - The only record evidence shows that Davis was communicating during this period with Kopsky (his broker) concerning arrangements for Davis to gift stock valued at approximately $10,000 to a charity golf tournament, which he co-chaired, to benefit the Saint Patrick's Center for the homeless. [Ex. I, Davis Dep. 141-53]

- The SEC admits that it does not know the exact nature of the information it claims Kopsky received from Davis before Kopsky bought ESSI stock on May 27. [Ex. D, SEC 10/1/07 Admission No. 4]

**D.    Speculation Concerning $100,000 Profits in Third Quarter 2003**

Kopsky traded around ESSI's earnings announcement in the third quarter of 2003.

He bought about $50,000 worth of ESSI stock options and $27,000 worth of ESSI stock

on August 22 and 25, and also bought an additional $1.1 million worth of ESSI securities

for his brokerage clients. ESSI announced its third quarter 2003 earnings results on

August 26, beating analysts' estimates and raising its 2003 earnings forecast. Kopsky

sold the ESSI securities for a personal profit of about $100,000, and a profit for his

clients of about $240,000. [Complaint ¶32, 33, 36, 40][19]

The SEC charges Davis with tipping Kopsky about ESSI's third quarter earnings,

but the evidence shows only the following:

- On August 20 or 21 – the day before Kopsky's first purchase – his fellow-broker and business partner John Virant obtained and gave Kopsky a just-issued A.G. Edwards research report on ESSI. Virant had been a broker for about 40 years, had built up a substantial investor client base, and had acted as a mentor to Kopsky when he first entered the securities business. [Ex. K, Virant Investigative Dep. 24-28, 84-90; Ex. M, Virant Affidavit, ¶¶ 1, 6-7]

  - The new research report raised A.G. Edwards' price prediction for ESSI stock from $45 to $51, and continued an "aggressive buy" recommendation. The report based its 13% increase in the price prediction on ESSI's "focus on rapid troop deployment, a central theme of the Bush-Rumsfeld DoD [Department of Defense]," as well as on ESSI's "recent acquisitions, Radian and TAMSCO," and "the growth opportunity of homeland security." [Ex. M, Virant Affidavit, Attachment]

  - Virant personally bought a substantial amount of ESSI stock for two funds he managed on August 22 and 25 – the very same two days Kopsky bought the stock for himself and clients. Virant made his purchases based on the same research report he gave Kopsky ("I had a report from A.G. Edwards ... and that was the basis of ... why I ... made the trade[s]"). [Ex. K, Virant Investigative Dep. 15, 84-90, 96; Ex. M, Virant Affidavit, ¶¶ 4-5]

  - The SEC took Virant's investigative deposition two years ago, and also received an affidavit from Virant, and thus the SEC has long been aware of Virant's discussions with Kopsky and Virant's parallel ESSI purchases. Yet the SEC has not charged Virant with any wrongdoing. [Ex. K, Virant Investigative Dep. 15, 84-90, 96; Ex. M, Virant Affidavit]

- Kopsky's contacts with ESSI senior executives *other than Davis* around the time of Kopsky's third quarter purchases include the following – an incomplete list:

---

[19] Kopsky put between $50,000 and $70,000 of his wealth at risk trading around ESSI earnings announcements in each quarter of 2003. As a professional stock trader he knew that a total loss of all funds invested was extremely unlikely, but he could actually afford to lose the entire amount he thus put at risk each quarter. Among other things, Kopsky made gifts to charity in 2002 and 2003 totaling roughly $50,000; had earnings of $459,000 in 2001, $410,000 in 2002, and $541,000 in 2003; had home equity of approximately $500,000; had deferred compensation of approximately $235,000 payable on June 30, 2005; and, had a net worth approaching $1 million in 2003. [Ex. J]

- On August 20, ESSI's Assistant Controller Diane Harsin phoned Kopsky at 9:57 am and again at 2:18 pm. [Ex. E] As Assistant Controller, Harsin already had ESSI earnings information by that time (unlike Davis). [Ex. A, Kreher Dep. 185-86] Kopsky invested in ESSI securities two days later.

- On August 21, ESSI's Controller Landmann phoned Kopsky at 8:35 am. [Ex. E] As Controller, Landmann already had ESSI earnings information by that time (unlike Davis). [Ex. A, Kreher Dep. 185-86] Kopsky invested in ESSI securities the following morning.

- Also on August 21, ESSI's director Michael Shanahan, Jr. (son of ESSI's Chairman) phoned Kopsky at 2:00 pm (also the day before Kopsky began buying). Shanahan, Jr. had also had lunch with Kopsky two days earlier. [Ex. E]

- Also on August 21, ESSI's Chief Financial Officer Gerhardt phoned Kopsky at 3:03 pm. [Ex. E] As CFO, Gerhardt already had ESSI earnings information by that time (unlike Davis). [Ex. A, Kreher Dep. 185-86] Kopsky invested in ESSI securities the following morning.

- Also on August 21, Kopsky emailed ESSI's Chairman Michael Shanahan, Sr. at his Florida vacation home at 7:17 pm and wrote: "Hope you are enjoying your trip. Shareholders certainly are." [Complaint ¶35] This message reflects the fact that ESSI stock hit a record high that day.

- On August 23 at 1:10 pm, Shanahan, Jr. again phoned Kopsky. This call was the day after Kopsky's initial purchases on August 22, and two days before his continuing purchases on August 25. [Ex. E][20]

- On August 21, Davis phoned Kopsky at 1:03 pm and spoke to him for 10 minutes, and at 4:54 pm and spoke for 22 minutes. A day elapsed between the calls and Kopsky's first purchase. Four days elapsed between the calls and Kopsky's further purchases. [Complaint ¶34, 36]

  - The SEC admits that it does not know the exact nature of what Davis said to Kopsky in either of the August 21 calls. [Ex. D, SEC 10/1/07 Admission Nos. 5 and 6]

---

[20] In providing the partial list available to us of Kopsky's contacts with various ESSI executives around the time of his trading in the first three quarters of 2003, we do not accuse any of these executives of tipping Kopsky. To the contrary, as discussed below, the actual record evidence here shows that Kopsky had other and legitimate reasons for his trading. The point is that if the SEC's approach of using innuendo and speculation to accuse Davis of tipping were to stand, it could as easily be applied to a number of other executives. This "dart board" approach to selecting a defendant to prosecute will leave the jury wondering about multiple "possibilities" – not "probabilities" – and with no evidentiary basis to render any verdict for the SEC. Without the "something more" discussed in the cases cited in Point IV.A above, summary judgment should be granted.

- In fact, Davis was communicating during this period with Kopsky and others concerning (i) Davis' responsibility to coordinate an August 26 political fundraiser at which President Bush would be speaking and which an ESSI director (the President's uncle) was hosting, and (ii) whether a particular individual in St. Louis was the daughter of then Defense Secretary Rumsfeld. [Ex. I, Davis Dep. 125-38]

- On August 21, at 5:09 pm, an email went to Davis and others that apparently contained some earnings information in an unidentified attachment. [Kreher Dep. 173-76] There is doubt as to which document was attached to the email and what information the attachment contained. [Ex. A, Kreher Dep. 177-80]

  - While Harsin, Landmann and Gerhardt had earnings information by August 19, such earnings information did not even become accessible to Davis until the August 21, 5:09 pm email. [Kreher Dep. 185-86]

  - However, while Davis only got electronic delivery of the email at 5:09 pm on August 21, the evidence indicates he did not actually open the email until August 22 when responding to Kreher.[21] [Kreher Dep. 173-76, 185-86] And there is no evidence that Davis contacted Kopsky on August 22 before Kopsky's purchase.

- The SEC admits that it does not know the exact nature of the information it claims Kopsky received from Davis before Kopsky bought ESSI stock on August 22 and 25. [Ex. D, SEC 10/1/07 Admission No. 7]

**E.    Kopsky's ESSI Trading Not Aberrational**

Kopsky's purchases before ESSI's earnings announcements in the first three quarters of 2003, and sales after the announcements, were consistent with his trading pattern and interest in ESSI securities, and his status as a sophisticated securities trader. An "inference [of scienter] can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence" *Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978); *SEC v. Heartland Advisors, Inc.*, 2006 U.S. Dist. LEXIS 62450, at

---

[21] While Kreher called Davis a "quick responder" to such emails, Kreher acknowledged that Davis did not respond until the next day, August 22. This would indicate that Davis did not open the email until the following morning. And Kreher could not recall Davis asking about the earnings numbers before August 22. [Ex. A, Kreher Dep. 175-76]

*10 (E.D. Wisc. 2006) (relying on *Freeman* in granting summary judgment dismissing SEC's complaint charging insider trading).[22]

As discussed below, **(i)** Kopsky had previously traded around ESSI earnings in the second quarter of 2001, investing an amount ten times greater than in his 2003 trading around earnings; **(ii)** Kopsky closely followed ESSI for years and had made other substantial six-figure investments in the company; **(iii)** Kopsky again traded around ESSI earnings in the fourth quarter of 2003, immediately following the period charged in the Complaint; **(iv)** Kopsky had a lawful "mosaic"

of information about ESSI that made it an attractive investment for him in 2003; and **(v)** Kopsky has articulated a sound basis for his trading, and furnished expert testimony in support of his trading judgments.

### 1. Earlier Kopsky Trading Around ESSI Earnings (*2nd* Quarter 2001).

Trading around ESSI earnings announcements was not a new strategy for Kopsky. Kopsky had previously traded around ESSI's earnings announcement in the second quarter of 2001. In that quarter, Kopsky bought about $540,000 worth of ESSI stock on May 21, the day before the earnings announcement. This $540,000 purchase was *ten times the size* of Kopsky's 2003 purchases around ESSI earnings announcements. On May 22, ESSI announced its earnings results, and Kopsky profitably sold the ESSI stock he had bought the day before. [Ex. F, p. 18 and Attachment 3] After a four year investigation, the SEC does not allege that this trading around an ESSI earnings announcement constituted insider trading.

---

[22] *See also Worlds of Wonder Securities Litig*, 35 F.3d 1407, 1427 (9th Cir. 1994) (defendants' explanation of reasons for their trading "would conclusively rebut an inference of scienter"); *In re Apple Computer Sec. Litig*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("unrebutted explanations [for certain stock sales] are sufficient to defeat any inference of bad faith").

**2. *Other Kopsky Six-Figure Investments in ESSI.*** Kopsky made other investments in ESSI that likewise were much larger than his 2003 ESSI purchases, and in some instances held ESSI stock for even shorter periods of time. For example, on September 10, 2001, Kopsky invested $157,500 in ESSI by purchasing 5,000 shares. Kopsky sold the stock on September 17, the next day that trading opened after the 9/11 tragedy, at a profit of approximately $45,000. He then bought back 5,000 shares later that same day (an investment in ESSI of over $200,000), and sold them before the close that day for an additional profit of approximately $10,000. On September 19, Kopsky bought 10,000 shares of ESSI for a total investment of $400,000, and sold those shares the next day for a profit of approximately $20,000. Kopsky made several other six-figure investments in ESSI before the trades that are the subject of the SEC's Complaint. [Ex. G, Kopsky Dep. 114-15; Ex. N] Again, the SEC does not allege that any of these large 2001 Kopsky investments in ESSI constituted insider trading.[23]

**3. *Later Kopsky Trading Around ESSI Earnings (4th Quarter 2003).*** In the quarter immediately following the ESSI trading at issue in the Complaint, Kopsky traded around ESSI's earnings announcement. In the fourth quarter of 2003, he bought 50 ESSI call options on November 11, another 50 options on December 5, and another 50 options on December 8. ESSI announced its earnings results on December 9 – yet another quarter of record earnings – and later the same day Kopsky sold the 150 ESSI options he had bought before the announcement at a profit of over $100,000. He also bought ESSI securities for his clients around the fourth quarter earnings announcement. [Ex. F, p. 18 and Attachment 3]

---

[23] The expert report of Dr. Sanjay Unni [Ex. F] describes Kopsky's substantial trading in the securities of other companies with characteristics similar to ESSI – further demonstrating that Kopsky's ESSI trading was far from aberrational for him.

Once again, the SEC has not charged this investment around the fourth quarter earnings announcement as a violation. The SEC simply speculates without supporting evidence that maybe Kopsky changed his trading pattern in the fourth quarter to avoid possible detection by the NASD. [Complaint ¶41-43; Ex. D, SEC 10/1/07 Admission No. 8]

    *4. Kopsky's "Mosaic" Information About ESSI.* Kopsky's trading was also not aberrational because he had an obvious and lawful informational advantage over other ESSI investors that made ESSI attractive to him.

Kopsky lawfully obtained multiple non-material "mosaic" pieces of information, as well as a general sense of ESSI's activities, that combined to lawfully give him a much fuller picture of the company than that had by other investors. "A

**REDACTED**

skilled analyst with knowledge of the company and the industry may piece seemingly inconsequential data together with public information into a mosaic which reveals material nonpublic information," and thus obtain a lawful informational advantage. *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980); *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 854 (2d Cir. 1981).[25]

> *5. **Rationale for Kopsky Trading Around ESSI Earnings.*** To analyze Kopsky's trading, Defendants retained Dr. Sanjay Unni of the LECG consulting firm. Unni holds a Ph.D. from Southern Methodist University, and has taught at SMU, the University of Strathclyde in Glasgow, and most recently at the University of California at Berkeley. In his expert report [Ex. F], Unni concludes that Kopsky's trading was reasonable and typical of his regular investment pattern:

- On at least seven occasions in the preceding three years, Kopsky had implemented a short-horizon trading strategy around the earnings announcements of companies *other than* ESSI, purchasing the company's stock prior to its earnings announcement and selling after the announcement. As discussed above, Kopsky also implemented a similar trading strategy with ESSI stock in 2001 (before the period involved in this matter), investing considerably greater sums in these transactions, and again in the fourth quarter of 2003 (immediately after the period involved in this matter).

- ESSI's common stock was similar in terms of its investment characteristics to the stocks Kopsky customarily held in his trading accounts. Like ESSI's stock, the majority of these stocks traded at high multiples of their book values per share at the times Kopsky purchased them, an indication that investors anticipated significant growth in their earnings capacity in the future. Like ESSI, the majority of these stocks had experienced an increase in the stock price over the prior year at the time when Kopsky purchased them. ESSI's market capitalization was well within the range observed among the other stocks traded by Kopsky.

- As a professional investment advisor, Kopsky was familiar with the potential rewards and risks associated with options. Kopsky had previously purchased and

---

[25] The SEC has long recognized the legality of assembling nonpublic information, itself not material, "to form a 'mosaic' which is only material after the bits and pieces are assembled into one picture." *In re Dirks*, Exchange Act Rel. No. 17480, 21 S.E.C. Docket (CCH) 1401, 1406 (Jan. 22, 1981). *See also Dirks v. SEC*, 463 U.S. 646, 658-59 (1983).

sold options on at least two other stocks besides ESSI's common stock, both before and after the fiscal quarters in question. Kopsky also purchased options on ESSI stock in the fourth quarter of 2003.

- The pattern of trades undertaken by Kopsky in ESSI securities during the first three quarters of 2003 are not consistent with the use of inside information. In each quarter, Kopsky's trades were less profitable than they would have been if he were acting rationally with inside information about ESSI. Moreover, the degree of risk to which Kopsky exposed his net wealth in these trades is consistent with his acting only on publicly available information.

At deposition, Kopsky explained his interest in ESSI and his reasons for trading in

ESSI securities as follows:

> "... I've been around this company since before they went public in ... 1985. And as I attended undergraduate classes, I was working at the company as a part-time summer employee. And Engineered Support was always my baseline analysis for any financial class that I took ... in college. ... And so, even in college, I was reading their annual reports. I was reading their 10 Qs [quarterly reports]. ...

> "And I continue ... to be an avid follower of Engineered Support from that point forward,

> "I traveled extensively throughout the country to, I believe, every single location facility within ... Engineered Support Systems. I toured every single facility. If they manufactured something, I went through those facilities. I asked questions on how they manufacture it, why they manufactured it, what was involved in the process.

> "I spoke with the presidents of those various divisions. I spoke with people that were on the line making those products. I wanted to know how they made them, why they made them, what was ... the process as to what they were doing. ... I took extensive time ... to research this company from top to bottom, and I talked to an awful lot of people within that organization to better understand it." [Ex. G, Kopsky Dep. 48-49][26]

---

[26] In any number of his frequent and regular contacts with senior officers at ESSI headquarters and around the country, Kopsky had the opportunity to develop a lawful "mosaic" of superior information about ESSI that could lawfully inform his decisions to trade ESSI securities. These could include general comments by ESSI executives and managers that business was good, observation that ESSI personnel were working long hours and had difficulty making time for calls and meetings, and an overall assessment of the mood of the many ESSI representatives he dealt with

REDACTED

With this general interest in ESSI as background, Kopsky went on to explain his particular reasons for trading around ESSI's 2003 earnings announcements as follows:

"Given the environment ... at the time ... and post 9/11 and that the products that Engineered Support made that, ... as their motto would state, the military doesn't leave home without us. And at that time, the build up to invade Iraq and the message that was being delivered by Engineered Support at the time which is ... in the event of a conflict, that there would be a strong likelihood of a ramp up in orders. ... [T]here was no defense company in the defense industry that was better positioned to benefit ... from a ground war, that was better positioned for the exact type of conflict that we had in Afghanistan, and the conflict that was being anticipated to occur in Iraq. No company ... was in a better position to benefit from that type of ... military action and the environment in which Congress was releasing funds as part of the defense budget.

"Engineered Support was ... in the exact location where ... the government wanted to spend their money which is on rapidly deployable military. And as a result, do I expect them to beat earnings? Yes." [Ex. G, Kopsky Dep. 152-53]

Indeed, Kopsky saw his faith in ESSI validated quarter after quarter. As ESSI's VP-Investor Relations testified at deposition, "as a general rule, throughout a several-year period of time, including 2003, [ESSI] beat analyst expectations for earnings per share pretty much every quarter." And "once we beat the ... analyst guidance for a quarter, invariably we raised ... our forecast for the year." ESSI raised guidance above previous estimates in all four quarters of 2003. [Ex. A, Kreher Dep. 60-61]

The SEC has identified a senior investigator on its own staff, Scott Hlavacek, as the only SEC employee it will call as a witness at trial. At deposition, Hlavacek testified that after reviewing records of Kopsky's trading, he had not formed any conclusion that the trading was suspicious:

"Q.   Based on your years of investigatory experience, have you reached any conclusion as to whether those ... trading activities appear suspicious?

"A.   No. ...

32

"Q. And regardless of whether you are going to testify about an opinion or not, have you reached any personal conclusion as to whether there was any suspicious activity in this case?

"A. I have not." [Ex. H, Hlavacek Dep. 42-44]

In sum, Kopsky's trading was rational and consistent with the decisions a sophisticated securities professional would make concerning ESSI during the first three quarters of 2003. The trading was not aberrational for Kopsky and will not add fuel to the circumstantial fire the SEC is desperately trying to kindle here.

## CONCLUSION

The SEC began investigating these 2003 events in 2004 and ultimately filed litigation in 2007. During its three-year pre-litigation investigation and the ensuing year of this litigation, the SEC took a total of 24 investigative and pretrial depositions, and with the full cooperation of ESSI's successor company DRS, the SEC obtained and analyzed boxes of brokerage, phone and other records, as well as vast quantities of emails.

Following this extensive and costly investigative and pretrial discovery, the SEC has in 2008 no more than the speculation it began with four years ago.[27] On this record, there is simply not enough for the SEC to proceed, and the Defendants and their families should be spared the pain, public embarrassment and expense of a jury trial on this unsupportable and meritless claim. Davis' motion for summary judgment should be granted, and the Complaint should be dismissed.

---

[27] After conducting its own thorough investigation of the now five-year-old alleged insider trading charged by the SEC in this case – including meeting personally with Davis and interviewing him, receiving the results of the polygraph examination conducted in the matter along with the so-called Wells submissions to the SEC, and presumably reviewing all of the evidence available at the time – the U.S. Attorney's Office for the Eastern District of Missouri determined not to bring any proceedings against Davis or Kopsky or others arising out of these same matters. The SEC thereafter filed its civil complaint in this case based upon essentially the same allegations it had previously referred to the U.S. Attorney, which were apparently rejected by that office as a basis for any further proceedings.

Dated: June 13, 2008

CAPES, SOKOL, GOODMAN,
& SARACHAN, P.C.

By: /s/ David V. Capes
DAVID V. CAPES – Fed. #2776
JEFFREY A. COHEN – Fed. #66834
7701 Forsyth Boulevard, 12th Floor
St. Louis, Missouri 63105
(314) 721-7701 (phone) / (314) 721-0554 (fax)
Email: cohen@capessokol.com

Stephen J. Crimmins
Thomas J. Hershenson
Michael S. Passaportis
**MAYER BROWN LLP**
1909 K Street NW, 12th Floor
Washington, DC 20006-1101
(202) 263-3000

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2008, the foregoing was served via U.S. Mail, postage prepaid, on the following counsel:

Robert M. Moye
Jeffrey A. Shank
Securities and Exchange Commission
175 West Jackson, Suite 900
Chicago, IL 60604

Richard B. Walsh, Jr.
R. Bradley Ziegler
Lewis, Rice & Fingersh, LC
500 North Broadway, Ste. 2000
St. Louis, MO 63102

/s/ David V. Capes